UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **14-20716 CR-SCOLA**

/OTAZO-REYES

18 U.S.C. § 1349
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
42 U.S.C. § 1320a-7b(b)(2)(A)
18 U.S.C. § 2
18 U.S.C. § 982

FILED by _____ D.C.

SEP 25 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA

vs.

ORELVIS OLIVERA,

        Defendant.

_____/

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.     The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were 65 or older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United

States Code, Section 1320-7b(f).

3. "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4. Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and provider number of the physician or other health care provider who ordered the services.

5. CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims. As administrator, Palmetto was to receive, adjudicate, and pay claims submitted by HHA providers under the Part A program for home health claims.

## Part A Coverage and Regulations
## Reimbursements

6. The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits. A patient qualified for home health benefits only if:

   a. the patient was confined to the home, also referred to as homebound;

   b. the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

   c. the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7. HHAs were reimbursed under the Home Health Prospective Payment System ("PPS"). Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care." The base payment was adjusted based on the health condition and care needs of the beneficiary. This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition. If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8. In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

### Record Keeping Requirements

9. Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10. Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the

patient was confined to his or her home and was in need of the planned home health services, and an OASIS form.

11. Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any instruction provided to the patient and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist, and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

## Special Outlier Provision

12. Medicare regulations allowed certified HHAs to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified home health agency. The certified HHA would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees. However, Medicare regulations prohibited one HHA merely serving as a billing mechanism for another agency.

13. For insulin-dependent diabetic beneficiaries, Medicare paid for insulin injections by an HHA when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary.

Additionally, for beneficiaries for whom occupational or physical therapy was medically necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14. While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries who had the most extensive care needs, which may result in an Outlier Payment to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

## The Defendant and a Relevant Entity

15. Acclaim Home Healthcare, Inc. ("Acclaim HH") was a Florida corporation incorporated on or about August 7, 2007, that did business in Miami-Dade County, Florida, as an HHA that purported to provide home health care and physical therapy services to eligible Medicare beneficiaries.

16. Defendant **ORELVIS OLIVERA**, a resident of Miami-Dade County, was the President, owner and operator of Acclaim HH.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1. Paragraphs 1 through 16 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. From in or around May 2008, and continuing through in or around at least June 2014, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ORELVIS OLIVERA,**

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a. to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b. to knowingly and with the intent to defraud, devise, and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.  It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) causing the submission of false and fraudulent claims to Medicare; (b) concealing the submission of false and fraudulent claims to Medicare; (c) diverting the fraud proceeds for their personal use and benefit, and the use and benefit of others, and to further the fraud.

## MANNER AND MEANS

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

4.  **ORELVIS OLIVERA** falsely certified to Medicare that Acclaim HH would comply with all Medicare rules and regulations, among which is a requirement to refrain from violating the anti-kickback statute.

5.  **ORELVIS OLIVERA** and others paid bribes and kickbacks to co-conspirator patient recruiters for the referral of Medicare beneficiaries to Acclaim HH, so that Acclaim HH could bill Medicare for home health services that were not medically necessary.

6.  **ORELVIS OLIVERA** and his co-conspirators caused Acclaim HH to submit approximately $7.9 million in false and fraudulent claims to Medicare.

7.  As a result of these false and fraudulent claims, Medicare paid Acclaim HH approximately $7.3 million.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1. Paragraphs 1 through 16 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. From in or around May 2008, and continuing through in or around at least June 2014, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ORELVIS OLIVERA,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

   a. to knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a federal health care program, that is, Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A); and

   b. to knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a federal health care program, that is, Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

## PURPOSE OF THE CONSPIRACY

3. It was the purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by: (1) offering and paying kickbacks and bribes in return for referring Medicare beneficiaries to Miami-Dade HHAs, including Acclaim HH, to serve as patients; (2) soliciting and receiving kickbacks and bribes in return for referring Medicare beneficiaries to Miami-Dade HHAs, including Acclaim HH, to serve as patients; and (3) submitting and causing the submission of claims to Medicare for home health services that Miami-Dade HHAs, including Acclaim HH, purported to provide to those beneficiaries.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

1. **ORELVIS OLIVERA** and his co-conspirators offered and paid kickbacks to co-conspirator patient recruiters in return for their referring Medicare beneficiaries to Acclaim HH for home health and physical therapy services.

2. **ORELVIS OLIVERA** solicited and received kickbacks in return for referring Medicare beneficiaries to serve as patients at other Miami-Dade HHAs.

3. **ORELVIS OLIVERA** and his co-conspirators caused Acclaim HH and other Miami-Dade HHAs to submit claims to Medicare for home health services purportedly provided to the recruited beneficiaries.

4. **ORELVIS OLIVERA** and his co-conspirators caused Medicare to pay Acclaim HH and other Miami-Dade HHAs based upon the home health service purportedly provided to the Medicare beneficiaries.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1. On or about December 8, 2009, **ORELVIS OLIVERA** deposited and caused to be deposited Check No. 9020 from Prime Home Health Services, Inc. in the amount of $6,998 into Acclaim HH's corporate bank account at Bank of America.

2. On or about January 29, 2010, **ORELVIS OLIVERA** deposited and caused to be deposited Check No. 09665 from Prime Home Health Services, Inc. in the amount of $12,321 into Acclaim HH's corporate bank account at Bank of America.

3. On or about May 12, 2010, **ORELVIS OLIVERA** paid and caused to be paid a kickback to a co-conspirator via Acclaim HH check No. 1123, drawn on Acclaim HH's corporate account at Bank of America, in the approximate amount of $5,998.

4. On or about June 2, 2010, **ORELVIS OLIVERA** paid and caused to be paid a kickback to a co-conspirator via Acclaim HH check No. 1154, drawn on Acclaim HH's corporate account at Bank of America, in the approximate amount of $3,002.

5. On or about August 16, 2010, **ORELVIS OLIVERA** paid and caused to be paid a kickback to a co-conspirator via Acclaim HH check No. 1267, drawn on Acclaim HH's corporate account at Bank of America, in the approximate amount of $3,002.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 3-4
### Receipt of Kickbacks in Connection with a Federal Health Care Benefit Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1. Paragraphs 1 through 16 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2. On or about the dates enumerated below as to each count, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

**ORELVIS OLIVERA,**

did knowingly and willfully solicit and receive remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, as set forth below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by Medicare, as set forth below:

| Count | Approximate Date | Approximate Kickback Amount |
|---|---|---|
| 3 | December 8, 2009 | $6,998 |
| 4 | January 29, 2010 | $12,321 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

## COUNTS 5-7
### Payment of Kickbacks in Connection with a Federal Health Care Benefit Program
### (42 U.S.C. § 1320a-7b(b)(2)(A))

1. Paragraphs 1 through 16 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2. On or about the dates enumerated below as to each count, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

**ORELVIS OLIVERA,**

did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, as set forth below, to a person to induce such person to refer an individual for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by Medicare as set forth below:

| Count | Approximate Date | Approximate Kickback Amount |
|---|---|---|
| 5 | May 12, 2010 | $5,998 |
| 6 | June 2, 2010 | $3,002 |
| 7 | August 16, 2010 | $3,002 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18, United States Code, Section 2.

### CRIMINAL FORFEITURE
### (18 U.S.C. § 982)

1. The allegations contained in this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purposes of alleging criminal forfeiture to the United States of America of certain property in which the defendant, **ORELVIS OLIVERA** has an interest.

2. Upon conviction of a violation of Title 18, United States Code, Section 1349, as alleged in this Indictment, the defendant shall forfeit to the United States of America any

property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation, pursuant to Title 18, United States Code, Section 982(a)(7).

3. Upon conviction of a violation of, or a conspiracy to violate, Title 42, United States Code, Section 1320a-7b(b)(2)(A), as alleged in this Indictment, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation, pursuant to Title 18, United States Code, Section 982(a)(7).

4. The property which is subject to forfeiture includes, but is not limited to, the following: All funds on deposit in account number 004431785990 held at Bank of America, N.A., in the name of Orelvis Olivera.

5. If any of the property described above, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(I).

All pursuant to Title 18, United States Code, Sections 982(a)(7) and the procedures outlined in Title 21 United States Code, Section 853, as incorporated by Title 18 United States Code, Section 982(b)(1).

A TRUE BILL

FOREPERSON

WIFREDO A. FERRER
UNITED STATES ATTORNEY

GEJAA GOBENA
For DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

KELLY GRAVES
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

-15-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. |
|---|---|
| vs. | |
| ORELVIS OLIVERA, | **CERTIFICATE OF TRIAL ATTORNEY\*** |
| Defendant. / | |

**Court Division**: (Select One)

| | | New Defendant(s) | ____ No ____ |
|---|---|---|---|
| __X__ Miami ____ Key West | | Number of New Defendants | ____ |
| ____ FTL ____ WPB ____ FTP | | Total number of counts | ____ |

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:   (Yes or No)   _Yes__
   List language and/or dialect   Spanish

4. This case will take __5__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)

   | I   | 0 to 5 days   | __X__ | Petty   | ____ |
   |-----|---------------|-------|---------|------|
   | II  | 6 to 10 days  | ____  | Minor   | ____ |
   | II  | 11 to 20 days | ____  | Misdem. | ____ |
   | IV  | 21 to 60 days | ____  | Felony  | __X__ |
   | V:  | 61 days and over | ____ | | |

6. Has this case been previously filed in this District Court?   (Yes or No)   __No__
   If yes:
   Judge:                              Case No.
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?   (Yes or No)   __No__
   If yes:
   Magistrate Case No.
   Related Miscellaneous numbers:
   Defendant(s) in federal custody as of
   Defendant(s) in state custody as of
   Rule 20 from the _____   District of

   Is this a potential death penalty case? (Yes or No)   __No__

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?   ____ Yes   __X__ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?   ____ Yes   __X__ No

_Kelly Graves_
KELLY GRAVES
TRIAL ATTORNEY, U.S. DEPARTMENT OF JUSTICE
SD FL Court ID No. A5501968

\*Penalty Sheet(s) attached

REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name: ORELVIS OLIVERA**

**Case No:** _____

Count #: 1

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349

* **Max. Penalty**: Twenty (20) years' imprisonment

Count #: 2

Conspiracy to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

***Max. Penalty:** Five (5) years' imprisonment

Counts #: 3 – 4

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

***Max. Penalty:** Five (5) years' imprisonment as to each count

Counts #: 5 – 7

Payment of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(2)(A)

***Max. Penalty:** Five (5) years' imprisonment as to each count

***Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**